AO 241 (Rev. 09/17)

# Petition for Relief From a Conviction or Sentence
# By a Person in State Custody

### (Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

### Instructions

1.    To use this form, you must be a person who is currently serving a sentence under a judgment against you in a state court.  You are asking for relief from the conviction or the sentence.  This form is your petition for relief.

2.    You may also use this form to challenge a state judgment that imposed a sentence to be served in the future, but you must fill in the name of the state where the judgment was entered.  If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file a motion under 28 U.S.C. § 2255 in the federal court that entered the judgment.

3.    Make sure the form is typed or neatly written.

4.    You must tell the truth and sign the form.  If you make a false statement of a material fact, you may be prosecuted for perjury.

5.    Answer all the questions.  You do not need to cite law.  You may submit additional pages if necessary.  If you do not fill out the form properly, you will be asked to submit additional or correct information.  If you want to submit any legal arguments, you must submit them in a separate memorandum.  Be aware that any such memorandum may be subject to page limits set forth in the local rules of the court where you file this petition.

6.    You must pay a fee of $5.  If the fee is paid, your petition will be filed.  If you cannot pay the fee, you may ask to proceed in forma pauperis (as a poor person).  To do that, you must fill out the last page of this form.  Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you.  If your account exceeds $ _____ , you must pay the filing fee.

7.    In this petition, you may challenge the judgment entered by only one court.  If you want to challenge a judgment entered by a different court (either in the same state or in different states), you must file a separate petition.

8.    When you have completed the form, send the original and _____ copies to the Clerk of the United States District Court at this address:

### Clerk, United States District Court for
### Address
### City, State  Zip Code

If you want a file-stamped copy of the petition, you must enclose an additional copy of the petition and ask the court to file-stamp it and return it to you.

9.    **CAUTION: You must include in this petition all the grounds for relief from the conviction or sentence that you challenge.  And you must state the facts that support each ground.  If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date**.

10.    **CAPITAL CASES: If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel**.

AO 241 (Rev. 09/17)

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | District: |
|---|---|

| Name (under which you were convicted): | Docket or Case No.: |
|---|---|

| Place of Confinement : | Prisoner No.: |
|---|---|

Petitioner (include the name under which you were convicted)       Respondent (authorized person having custody of petitioner)

v.

The Attorney General of the State of:

**PETITION**

1.    (a) Name and location of court that entered the judgment of conviction you are challenging:

_____

_____

_____

       (b) Criminal docket or case number (if you know): _____

2.    (a) Date of the judgment of conviction (if you know): _____

       (b) Date of sentencing: _____

3.    Length of sentence:

4.    In this case, were you convicted on more than one count or of more than one crime?   ☑ Yes       ☐ No

5.    Identify all crimes of which you were convicted and sentenced in this case: _____

_____

_____

_____

_____

_____

6.    (a) What was your plea? (Check one)

|  | ☑ (1) | Not guilty | ☐ (3) | Nolo contendere (no contest) |
|---|---|---|---|---|
|  | ☐ (2) | Guilty | ☐ (4) | Insanity plea |

AO 241 (Rev. 09/17)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? _____

_____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

   ☑ Jury      ☐ Judge only

7.    Did you testify at a pretrial hearing, trial, or a post-trial hearing?

   ☐ Yes      ☐ No

8.    Did you appeal from the judgment of conviction?

   ☑ Yes      ☐ No

9.    If you did appeal, answer the following:

(a) Name of court: _____

(b) Docket or case number (if you know): _____

(c) Result: _____

(d) Date of result (if you know): _____

(e) Citation to the case (if you know): _____

(f) Grounds raised: _____

_____

_____

_____

_____

_____

_____

(g) Did you seek further review by a higher state court?      ☐ Yes      ☐ No

   If yes, answer the following:

   (1) Name of court: _____

   (2) Docket or case number (if you know): _____

   (3) Result: _____

   _____

AO 241 (Rev. 09/17)

(4) Date of result (if you know): _____

(5) Citation to the case (if you know): _____

(6) Grounds raised: _____

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?     ❏ Yes     ❏ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10.    Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?     ☑ Yes     ❏ No

11.    If your answer to Question 10 was "Yes," give the following information:

(a)    (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

❏ Yes     ❏ No

(7) Result: _____

AO 241 (Rev. 09/17)

          (8) Date of result (if you know):   10/11/2016 ; reconsideration denied 12/20/2018

    (b) If you filed any second petition, application, or motion, give the same information:

          (1) Name of court:

          (2) Docket or case number (if you know):

          (3) Date of filing (if you know):

          (4) Nature of the proceeding:

          (5) Grounds raised:

          (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

          ❏ Yes    ❏ No

          (7) Result:

          (8) Date of result (if you know):

    (c) If you filed any third petition, application, or motion, give the same information:

          (1) Name of court:

          (2) Docket or case number (if you know):

          (3) Date of filing (if you know):

          (4) Nature of the proceeding:

          (5) Grounds raised:

AO 241 (Rev. 09/17)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

❑ Yes     ❑ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application,

or motion?

(1) First petition:     ✔ Yes     ❑ No

(2) Second petition:    ❑ Yes     ❑ No

(3) Third petition:     ❑ Yes     ❑ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.  Any legal arguments must be submitted in a separate memorandum.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court.  Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(c)     **Direct Appeal of Ground One:**

     (1) If you appealed from the judgment of conviction, did you raise this issue?    ❏ Yes    ❏ No

     (2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

     (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        ☑ Yes    ❏ No

     (2) If your answer to Question (d)(1) is "Yes," state:

     Type of motion or petition: _____

     Name and location of the court where the motion or petition was filed: _____

_____

     Docket or case number (if you know): _____

     Date of the court's decision: _____

     Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

     (3) Did you receive a hearing on your motion or petition?    ☑ Yes   ❏ No

     (4) Did you appeal from the denial of your motion or petition?    ☑ Yes   ❏ No

     (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ☑ Yes  ❏ No

     (6) If your answer to Question (d)(4) is "Yes," state:

     Name and location of the court where the appeal was filed: _____

_____

     Docket or case number (if you know): _____

     Date of the court's decision: _____

     Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

     (7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

(c)     **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?     ❐  Yes     ❐  No

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

    _____

    _____

(d)     **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

    ☑ Yes     ❐   No

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed: _____

    _____

    _____

    Docket or case number (if you know): _____

AO 241 (Rev. 09/17)

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?           ☑ Yes      ☐ No

(4) Did you appeal from the denial of your motion or petition?       ☑ Yes      ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☑ Yes      ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two : _____

_____

_____

_____

**GROUND THREE:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c)    **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ❑  Yes    ❑  No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ❑   No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?                        ☑ Yes    ❑ No

(4) Did you appeal from the denial of your motion or petition?                   ☑ Yes    ❑ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☑ Yes    ❑ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

AO 241 (Rev. 09/17)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c)      **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?         ❐   Yes       ❐  No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)      **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ❐  No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

AO 241 (Rev. 09/17)

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?               ☑ Yes        ☐ No

(4) Did you appeal from the denial of your motion or petition?          ☑ Yes        ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☑ Yes        ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

_____

_____

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

13.    Please answer these additional questions about the petition you are filing:

    (a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court

        having jurisdiction?  ☑ Yes    ❏    No

        If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

        presenting them: _____

        _____

        _____

        _____

    (b)    Is there any ground in this petition that has not been presented in some state or federal court?  If so, which

        ground or grounds have not been presented, and state your reasons for not presenting them:

        _____

        _____

        _____

14.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

    that you challenge in this petition?        ❏    Yes        ❏    No

    If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues

    raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy

    of any court opinion or order, if available. _____

    _____

    _____

    _____

    _____

    _____

    _____

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

    the judgment you are challenging?        ❏    Yes        ❏    No

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues

    raised. _____

    _____

    _____

    _____

    _____

AO 241 (Rev. 09/17)

16.     Give the name and address, if you know, of each attorney who represented you in the following stages of the

         judgment you are challenging:

         (a) At preliminary hearing: _____

         _____

         (b) At arraignment and plea: _____

         _____

         (c) At trial: _____

         _____

         (d) At sentencing: _____

         _____

         (e) On appeal: _____

         _____

         (f) In any post-conviction proceeding: _____

         _____

         (g) On appeal from any ruling against you in a post-conviction proceeding: _____

         _____

         _____

17.     Do you have any future sentence to serve after you complete the sentence for the judgment that you are

         challenging?           ❒    Yes    ❒    No

         (a) If so, give name and location of court that imposed the other sentence you will serve in the future:

         _____

         _____

         (b) Give the date the other sentence was imposed: _____

         (c) Give the length of the other sentence: _____

         (d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the

         future?            ❒    Yes    ❒    No

18.     TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain

         why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

         _____

         _____

         _____

         _____

         _____

AO 241 (Rev. 09/17)

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

(A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241 (Rev. 09/17)

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:  issue writ of habeas corpus

or any other relief to which petitioner may be entitled.

/s/ Dennis Shedd

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on    N/A    (month, date, year).

Executed (signed) on  August 2, 2021   (date).

Frederick Henderson

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition:

Print   Save As...   Reset

### COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**

**SUPERIOR COURT
CRIMINAL ACTION
No. SUCR2011-11265**

### COMMONWEALTH

### vs.

### FREDERICK HENDERSON

### DECISION AND ORDER ON DEFENDANT'S MOTION FOR A NEW TRIAL

The defendant and co-defendant Frankie Herndon were indicted for First Degree Murder in the death of Derrick Barnes. Following a jury trial before a different judge (Brady, J.) the defendant and the co-defendant were convicted of First Degree Murder. The defendant was convicted on the theory of premeditation. He was also convicted on the charge of Possession of a Firearm. The defendant, Henderson, has filed a Motion for New Trial arguing that justice may not have been done due to ineffective assistance of counsel at his trial.

A trial court may grant a new trial only "if it appears at any time that justice may not have been done." Mass. R. Crim. P. 30(b); *Commonwealth* v. *Lopez,* 426 Mass. 657, 662 (1998); *Commonwealth* v. *Brown,* 378 Mass. 165, 171 (1979). "Judges are to apply the standard set forth in rule 30(b) rigorously and should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth." *Commonwealth* v. *Wheeler,* 52 Mass. App. Ct. 631, 635-36 (2001). A judge may, in his discretion, decide a motion for a new trial without an evidentiary hearing where no substantial issue is raised by the motion or the affidavits. *Commonwealth* v. *Wallis,* 440 Mass. 589, 596 (2003); *Wheeler, supra,* at 638; Mass. R. Crim. P. 30(c) (3). To determine whether a substantial

1

issue has been raised, the Court considers not only the seriousness of the issues asserted, but also the adequacy of the defendant's showing on those issues. *Commonwealth* v. *DeVincent*, 421 Mass. 64, 67 (1995). The Court is not required to credit assertions in affidavits submitted in support of a motion, but may evaluate such offerings in light of factors pertinent to credibility, including bias, self-interest and delay. See *Commonwealth* v. *Grant*, 426 Mass. 667, 673 (1998).

The defendant claims that his rights under the Sixth and Fourteenth Amendments and Article 12 were violated by his having received ineffective assistance of counsel at his trial. The defendant sets out five specific areas where he claims that counsel was ineffective. A claim of ineffective assistance of counsel warrants a new trial only if the defendant establishes that counsel's conduct fell measurably below the standard of an ordinary fallible lawyer, and that such inadequacy "likely deprived the defendant of an otherwise available, substantial ground of defense. *Commonwealth* v. *Comita*, 441 Mass. 86, 93 (2004); *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). In evaluating such a claim, the Court "indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Commonwealth* v. *Florentino*, 396 Mass. 689, 690 (1986). Counsel's strategic decisions are ineffective only if they are "manifestly unreasonable when made." *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999).

*I.     Failure to Move to Suppress Identification of Single Photograph*

The defendant must show "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "The failure of counsel to litigate a viable claim of an illegal search and seizure is a denial of the defendant's Federal and State constitutional right to the effective assistance of counsel." *Commonwealth v. Pena,* 31

Mass.App.Ct. 201, 204, 207, 575 N.E.2d 774 (1991).  In a motion for new trial context, it is not ineffective assistance of counsel when trial counsel declines to file a motion with a minimal chance of success or would have had no real effect on the final outcome of the case. However, in order to prevail on an ineffective assistance of counsel claim on the ground of failing to file a motion to suppress, the defendant has to demonstrate a likelihood that the motion to suppress would have been successful. *Commonwealth v. Comita*, 441 Mass 86.

Trial counsel stated in his affidavit that he considered filing a Motion to Suppress the Identification but decided against doing so. He stated that he did not think that the motion would be successful because the issue in the motion would hinge on how often Griffin had seen the defendant and that counsel believed that the judge would consider this a jury issue. He correctly believed that an identification from a single photo is proper when the witness knows the defendant.  Even had the identification been excluded, the testimony regarding the witnesses saying that they saw "Drano" do the shooting would still have been admissible. Trial counsel also stated that he did not want to flag to the prosecutor possible areas of cross examination that he wished to pursue at the trial.

The above stated strategy of trial counsel regarding the Motion to Suppress was reasonable under the circumstances of this specific case and trial. The strategy did not fall measurably below the standard of an ordinary fallible lawyer, and this strategy did not deprive the defendant of an otherwise available, substantial ground of defense.


II.    *Failure to Present Evidence Supporting Misidentification Defense*

One of the witnesses testified that she thought that the individual known as "Drano" (later identified as the defendant) was shorter than "Jigga" (later identified as co-defendant Herndon).

The defendant argues that his counsel failed to introduce booking sheets that showed that the defendant and the co-defendant were the same height.

The defendant argues that the failure to introduce evidence that the defendant was the same height as his co-defendant was ineffective assistance of counsel. Trial Counsel indicated that he did not think that the evidence that the defendant's appearance did not match the description given by witness Griffin "would have added that much". The height difference was only a couple of inches at most. The jury had the opportunity to view both defendants together at trial and make their own observations. In light of the other evidence relating to the defendant, failure to introduce this evidence did not fell measurably below the standard of an ordinary fallible lawyer, and that this strategic decision did not deprive of effective representation.

The defendant also claims that failure to present an eyewitness identification expert constituted ineffective assistance of counsel. Trial counsel stated that he had considered filing a motion for funds to retain an identification expert but did not do so, as he did not think the motion would be allowed as the witness Griffin had stated that she knew the defendant. In addition, there was testimony that witness Rondale Williams said that he was on the same set of steps that the victim was on.

Trial counsel also stated that he thought that an identification expert would not have added much in light of his own cross examination of the police officers. The current motion, while it contains a copy of the *Supreme Judicial Court Study Group on Eyewitness Evidence, Report and Recommendations to the Justices (*(2013), does not contain an affidavit from an expert as to what opinions or testimony would have been offered in this specific case. The record is too speculative to make a finding that trial counsel's strategy in not offering an identification witness was manifestly unreasonable. *Commonwealth v. Rice,* 441 Mass 291 (2004).

III.    *Failure to Request a Limiting Instruction Regarding Motive Evidence Offered by Co-Defendant*

At trial, the co-defendant testified and on cross examination the prosecutor elicited testimony regarding the fact that he and the victim had both testified in a prior proceeding. The co-defendant also testified about snitches and rats. Counsel for the defendant did not request a limiting instruction as to this testimony.

The failure to provide a limiting instruction regarding Herndon's motive testimony, even if error, was not overly prejudicial in the context of the totality of the evidence, as the error did not influence the jury, or had but very slight effect." *Commonwealth v. Christian*, 430 Mass. 552, 563, 722 N.E.2d 416 (2000), *Commonwealth v. Purdey,* 459 Mass 442 (2011). Herndon was subject to cross examination by the defendant. There was also independent evidence of the defendant being one of the shooters. There was no evidence or argument that the defendant was involved in the prior proceeding. Motive is not an element of the crime and the co-defendant's testimony was not the only evidence the Commonwealth relied upon to show the defendant's involvement. In this case, where there was additional testimony of the defendant's use of the firearm, the evidence of the co-defendant's possible motive did not create enough prejudice, if any, to require a new trial.

IV.    *Failure to Object to Introduction of Grand Jury Testimony*

The defendant concedes that portions of Griffin's grand jury testimony was properly admitted. He alleges that it was ineffective assistance of counsel not to object to other portions of Griffin's grand jury testimony. In this case a voir dire was conducted regarding the witness' grand jury testimony and the trial judge ruled that the witness' lack of memory was feigned and

5

that portions of her testimony could be admitted substantively. The witness Griffin's grand jury testimony as to her being introduced to a man known as "Drano" and that she recognized "Drano" as being at the shooting was admitted. Additional grand jury testimony was introduced regarding what happened after this point.

Failure to object to the additional grand jury testimony did not create such prejudice as to require a new trial. Griffin was available for cross examination. The key part of her grand jury testimony was her knowing "Drano" and having seen him at the shooting scene. There is no argument that this evidence was not properly admitted. The testimony that the defendant now argues should have been objected to was, at best, somewhat corroborative of her having seen the entire incident. It did not go towards her identification of "Drano" as being at the scene or how she knew "Drano". Any failure to object to this evidence and require a proper foundation for its admission was not overly prejudicial.

## V.   Failure to Object to Prosecutor's Closing Argument.

Remarks made during closing arguments are considered in context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury. *Commonwealth v. Durand,* _____ Mass. _____ (2016). The defendant argues that it was ineffective assistance of counsel not to object to two misstatements made by the prosecutor in the closing arguments. One statement regarded witness Griffin saying to the Grand Jury that the defendant shot the victim and the second statement went to how many times Griffin had seen the defendant. Trial counsel in his affidavit stated that he did not object to either statement in the closing as he did not think the first misstatement was harmful and as to the second statement he indicated that he thought that there was a dispute as to how often Griffin had seen the defendant.

As an additional consideration, the trial judge instructed the jury that the closing arguments were not evidence and that if there were any disputes as to the evidence, it was to be the jury's memory of the evidence that controls.

Failure to object to the statements made in the prosecutor's closing does not warrant a new trial in this case.

*Errors in Totality Require a New Trial*

The defendant argues that the totality of the errors at trial created a substantial likelihood of a miscarriage of justice. The Court disagrees. While recognizing that this defendant and his co-defendant have separate issues and alleged errors, the Court does recognize that the Supreme Judicial Court affirmed the co-defendant's conviction in *Commonwealth v. Herndon,* 475 Mass 324 (2016). In that decision, the SJC held that the trial judge did not abuse his discretion in denying a proposed identification instruction. It was further held that there was no error in the admission of the pretrial statement of witness' identification. The SJC in reviewing the record in the case did not find a basis to order a new trial.

As discussed above, none of the allegations of ineffective assistance of counsel merit an order for a new trial. A review of the record establishes that there was no showing of a substantial likelihood of a miscarriage of justice or a violation of the defendant's right under the Sixth and Fourteenth Amendments and Art. 12.


### ORDER

The defendant's Motion for a New Trial is **DENIED**

7

WILLIAM F. SULLIVAN
Justice of the Superior Court

DATE: October 11, 2016

8

73

# COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**

**SUPERIOR COURT
CRIMINAL ACTION
NO. 11-11265**

## COMMONWEALTH

### vs.

### FREDERICK HENDERSON

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO RECONSIDER THE DENIAL OF HIS MOTION FOR NEW TRIAL

The defendant Frederick Henderson and his co-defendant Frankie Herndon were indicted for First Degree Murder in the death of Derrick Barnes. After a jury trial, the defendant and the co-defendant were convicted of First Degree Murder on June 14, 2013. Henderson was also convicted of possession of a firearm.

On February 12, 2015, Henderson filed a Motion for a New Trial under Mass. R. Crim. P. 30(b) arguing that he received ineffective assistance of counsel at his trial. His motion offered five reasons why his counsel was ineffective. This Court denied the defendant's motion (see Paper #65) concluding that with respect to all five of the defendant's claims, the record did not establish a substantial likelihood of a miscarriage of justice or a violation of the defendant's rights under the Sixth and Fourteenth Amendment or Article 12.

The defendant now seeks reconsideration on the Court's previous denial of his Motion for New Trial with respect to one of his claims: whether trial counsel was ineffective for failing to present an expert in eyewitness identification. For the reasons that follow, the defendant's Motion to Reconsider the Denial of His Motion for New Trial is **DENIED**.

1

## BACKGROUND

At trial, the jury heard the following evidence relevant to this motion.

On August 27, 2011, Derrick Barnes was shot multiple times on the porch of 11 Fayston Street in Dorchester. Henderson, known by his nickname "Drano," and Herndon, known by his nickname "Jigga," were later arrested for the shooting. Police detectives testified at trial that two witnesses Shantee Griffin, who lived at 14 Fayston Street, and Rondale Williams, the victim's cousin, had identified Henderson as one of the shooters.

When the shooting occurred, Griffin was across the street, about 110 feet away, in front of her home at 14 Fayston Street. She called 911 and then attempted to help the victim. Minutes after the shooting, the victim's brother came onto the scene and asked Griffin what had happened, and she said she did not know. Soon after, Boston Police and Boston EMS arrived. Officer Joseph Coherty attempted to ask Griffin if she had any information about the shooting but she did not respond. He spoke with her later and she stated that she had heard the shots but did not see anything. Officer Brian Johnson also spoke with Griffin after the shooting, and she told him that she saw one shooter. She also stated that she was afraid to talk about the shooting and did not want to speak with him at her door. She gave Officer Johnson her number and told him he could call her.

The night of the shooting, Boston Police Detective James Wyse called Griffin on the telephone. Griffin told him that she saw Herndon and Henderson do the shooting.

On August 31, 2011, Griffin came to Boston Police Headquarters where two police detectives interviewed her. During the interview, the detectives showed Griffin two photographs. She identified one photograph as a picture of Herndon and one as a picture of Henderson.[1]

---

[1] Griffin as well as the other witnesses referred to Herndon and Henderson by their nicknames. For the sake of clarity, the Court has substituted Herndon's and Henderson's names in place of their nicknames.

On September 1, 2011, Griffin testified before the grand jury. She stated that she had been introduced to Herndon by a friend two years earlier and that she saw him everyday for the two years that she lived on Fayston Street. She described him as "six-feet tall, dark skinned, low haircut [and with a] dark spot on the right side of his cheek" (VII: 47). She also testified before the grand jury that she knew Henderson as well and was introduced to him by the same person who introduced her to Herndon, but she did not see Henderson as often as she saw Herndon.

Griffin testified that on the day of the shooting, she was at 10-12 Fayston, the house next door to the one where she lived, when she saw two men walking down the street. She "recognized [Herndon] off the top" and when they got closer she recognized Henderson. (VII:82-84). Griffin stated, "I knew who [Henderson] was," and she described what both men were wearing. (VII:82). She explained that it was still light out at the time and the two men stopped in front of 11 Fayston on the sidewalk. She then saw [Herndon's] mouth move and he pulled a gun out and started shooting. She said, "[Henderson] was standing there. He was on the sidewalk first, but when he did the last shots, he went to the middle of the street." (VII:92-93). Herndon fired more shots at the victim while he was on the ground.

Griffin further testified that when she went to the police station after the shooting, she was shown two photographs by police; the first person they showed her was Herndon and the second one was Henderson. She stated that she identified the two men in the pictures and signed her name on the back of the photographs, and that those two men were the ones she saw on Fayston Street during the shooting.

At trial, when asked if she told Detective Wyse over the phone that Herndon and Henderson were the shooters, Giffin answered "No." (VII:119). She testified that she went to the police station on August 31, 2011 but did not remember who she met with and did not

remember seeing photographs. (VII:120-121). She answered affirmatively that it was her signature on the back of the photographs identifying Herndon and Henderson but stated that it was not her handwriting. She stated that she did not know either Herndon or Henderson and had been told by other people that Herndon and Henderson were the shooters.

The Commonwealth admitted Griffin's grand jury testimony into evidence at the trial. The prosecutor read portions of Griffin's grand jury testimony to Griffin on direct examination, and she acknowledged what was written in the grand jury transcript. On cross examination, Griffin testified that she had bipolar disorder which affected her memory and ability to communicate. She said felt pressured both when she spoke with police after the shooting and during her testimony before the grand jury and that when she is pressured, she sometimes tells people what they want to hear. (VII:144). She also testified that because of a van parked on Fayston Street, her view of the shooting would have been obstructed.

Rondale Williams was on the porch of 11 Fayston Street, the site of the shooting, when it occurred. After the shots were fired, he fled from the porch to a house down the street and called 911. Police detectives spoke with Williams, almost a week after the murder, on September 2, 2011, at an apartment in Mattapan. Detective Benton described Williams as "very excited" to tell what he had seen the night of the shooting. (XI:36). Williams said that on August 27, 2011, at around 7:00 p.m. he was standing on the porch at 11 Fayston Street when Henderson and Herndon walked up on him and the others in front of the porch. He explained that Henderson pulled out a gun and shot the victim, and Herndon shot the victim as well after he was wounded.

At trial, Williams testified that he had known Herndon for about sixteen years and Henderson since 2005. Henderson had stayed with his aunt in the past. At the time of the shooting, he was intoxicated and rolling a blunt on the porch of 11 Fayston. The shooters were

4

no more than fifteen feet away from him but he did not look up at the faces of the two men that shot the victim. Williams stated that he did not recall speaking with the detectives on September 2, 2011 at the Mattapan apartment where he identified Henderson as one of the shooters.

On June 14, 2013, the jury returned a guilty verdict on the First Degree Murder Charge. Herndon appealed and the Supreme Judicial Court affirmed the conviction. Henderson filed a motion for new trial which this Court denied on October 11, 2016. With regards to the Henderson's claim that his trial counsel was ineffective for failing to present an eyewitness identification expert, the Court concluded that "[t]he record was too speculative to make a finding that trial counsel's strategy in not offering an identification witness was manifestly unreasonable."

After the Court denied Henderson's motion for new trial, the Court allowed his Motion for Authorization of Funds for an Eyewitness Identification Expert. The defendant then filed the instant Motion to Reconsider the Denial of His Motion for New Trial. With his Motion to Reconsider, the defendant has attached an affidavit from Professor Ayanna Thomas of Tufts University in which she opines on the reliability of the eyewitness identifications.

In the affidavit, Professor Thomas discusses the variables that can affect the reliability of eyewitness identification. These include "estimator variables" that affect a witness's ability to see and remember the event in question and "system variables" which refer to the identification procedures. She then details the variables that may have affected Griffin's and Williams' identifications of Henderson including the distance from the perpetrators, the lighting, the exposure duration, stress, intoxication, etc. Professor Thomas ultimately concludes that "the

presence of the stated risk factors increased the likelihood of errors in the memory reconstruction process."

## DISCUSSION

When a defendant who has been convicted at trial brings a motion under Rule 30(b) for a new trial, the court may grant that motion at any time if it appears that justice may not have been done. *Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981). "Judges are to apply the standard set forth in rule 30(b) rigorously and should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth." *Commonwealth* v. *Wheeler*, 52 Mass. App. Ct. 631, 635–636 (2001). To determine whether a substantial issue has been raised, the Court considers not only the seriousness of the issues asserted, but also the adequacy of the defendant's showing on those issues. *Commonwealth* v. *DeVincent*, 421 Mass. 64, 67 (1995). The burden of showing prejudice sufficient to warrant a new trial rests with the defendant. *Commonwealth* v. *Schand,* 420 Mass. 783, 788 n. 1 (1995).

The defendant claims ineffective assistance of counsel regarding his trial attorney's failure to procure an eyewitness identification expert during trial. To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that "there has been serious incompetency, inefficiency, or inattention of counsel—behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer-and, if that is found, then . . . [that] it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth v. Saferian,* 366 Mass. 89, 96 (1974). In evaluating such a claim, the Court indulges "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Commonwealth v. Florentino,* 396 Mass. 689, 690 (1986).

6

Counsel's strategic decisions are ineffective only if they "manifestly unreasonable when made." See *Commonwealth* v. *Glover,* 459 Mass. 836, 844 (2011).

The defendant argues that an expert should have been presented because it would have educated the jury about scientific principals which may have affected the reliability of identifications by the two eyewitnesses in this case. The presentation of such evidence, however, would not "have accomplished something material for the defense" in this case. See *Commonwealth* v. *Acevado*, 446 Mass. 435, 442 (2006), quoting *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977). The issue at trial regarding the eyewitnesses' identification of Henderson was not whether they had misidentified him. In fact, both Griffin and Williams testified at trial that they had not actually seen the shooters and therefore could not identify them. Rather, the issue before the jury was whether the eyewitnesses told the truth prior to trial when they identified Henderson as one of the shooters to the police and the grand jury or whether they were telling the truth at trial when they testified that they previously lied and had not actually seen the shooters. Accordingly, the issue before the jury was whether the two witnesses were credible—one in which expert testimony is unnecessary. See *Commonwealth* v. *Federico,* 425 Mass. 844, 848-849 (1997). Thus, there was no reason for counsel to present an expert.

But even assuming such expert testimony would have been helpful, the Court concludes that the defendant has not shown that trial counsel's decision not to call the expert was one that "lawyers of ordinary training and skill in criminal law would not consider competent" given that many of the concepts explored in the expert affidavit were raised at trial through cross-examination. See *Commonwealth* v. *Holland*, 476 Mass. 801, 812 (2017); see also *Commonwealth* v. *Ayala*, 2018 WL 6378501 at *10 (Mass. 2018) (failure to present eyewitness expert was manifestly unreasonable where witness identification was vigorously challenged on

cross examination). During cross-examination of both Griffin and Williams, counsel attacked the reliability of their pre-trial identifications of Henderson. With regards to Griffin, trial counsel questioned her ability to see the shooting based on where she was standing on her porch. He also challenged the reliability of her identification based on her mental and emotional state and suggested that her bipolar disorder affected her memory and ability to communicate. Counsel questioned Griffin on if it was police pressure that led to her previous identification. He similarly challenged the reliability of Williams' pretrial identification of the defendant by cross-examining Williams on his focus during the shooting and his ability to make an identification of the shooter given his state of intoxication. Furthermore, during cross examination of Detectives Benton and Wyse, counsel attacked the detectives' interactions with the witnesses during the identification and interview process by questioning, among other things, the suggestiveness of the identification procedure they used and the extent they sought to corroborate or follow up on the information that witnesses gave them.

Accordingly, trial counsel made a tactical decision to challenge the reliability of the witness identifications through cross-examination rather than present an expert. Given that both witnesses agreed that their previous identifications were unreliable, the presentation of an expert witness would not have substantially aided the jury in its evaluation of the witnesses' identifications.[2] Trial counsel's strategy therefore, regardless of its success or failure, was not

---

[2] The Court notes that the usefulness of an expert testimony on identification in this case may have been further diminished by fact that both eyewitnesses in this case were familiar with the defendant prior to the shooting, and that Griffin supplied the names (or nicknames) of the shooters before the police suggested any suspects. See *Commonwealth* v. *Carr*, 464 Mass. 855, 871 (2013) (because "the witnesses knew the defendant from the neighborhood and witnessed the shooting in broad daylight; it is unlikely that suggestiveness would have played much of a role in their identifications"). Further, given Professor Thomas' description of "unconscious transference" as occurring when the witness encounters the innocent suspect at the crime scene, the presentation of expert testimony on this theory would have undermined the defendant's alibi defense.

manifestly unreasonable.  See *Commonwealth* v. *Watson*, 455 Mass. 246, 257–258 (2009);

*Ayala*, 2018 WL 6378501 at *10.

## **ORDER**

For the foregoing reasons, the defendant's Motion to Reconsider the Denial of His

Motion for New Trial is **DENIED**.

Dated:  December 20, 2018

William F. Sullivan
Justice of the Superior Court

9

Supreme Judicial Court/Massachusetts Appeals Court
*Citation:* **486** Mass. **296**
*Parties:* **Commonwealth vs. Frederick Henderson.**
*County:* **Suffolk**
*Hearing Date:* **November 8, 2019**
*Decision Date:* **November 30, 2020**
*Judges:* **Gants, C.J., Lenk, Gaziano, Lowy, & Budd, JJ.[1]**

Homicide. Firearms. Constitutional Law, Assistance of counsel,
Identification. Identification. Evidence,
Identity, Exculpatory, Expert opinion, Motive, Testimony before grand
jury. Witness. Expert. Jury and Jurors. Practice, Criminal, Capital case,
Assistance of counsel, Instructions to jury, Argument by prosecutor,
Transcript of testimony before grand jury, Grand jury proceedings, Jury
and jurors, Challenge to jurors, Voir dire.

A criminal defendant failed to establish that counsel at his murder trial
was ineffective in failing to file a motion to suppress identification
evidence, where the defendant had not shown that any error in choosing not
to file such a motion likely would have influenced the jury's verdicts
[301-303]; similarly, the defendant did not establish that counsel was
ineffective for failing to introduce allegedly exculpatory evidence that
would not have added much to the defendant's misidentification defense
[303-304]; likewise, the defendant failed to demonstrate that his
counsel's decision not to retain an expert witness on eyewitness
identification was manifestly unreasonable [304-306]; in the same vein,
the defendant failed to establish that he was prejudiced by his trial
counsel's failure to request a limiting instruction regarding evidence of
a codefendant's motive for murder, given the admission of circumstantial
evidence from which the jury could infer that the defendant shared the
same motive [306-307]; finally, the defendant failed to establish that a
substantial likelihood of a miscarriage of justice arose from trial
counsel's failure to object to relatively brief misstatements of evidence
in the prosecutor's closing argument [307-309].

    At a murder trial, no reversible error arose from the manner in which
the judge permitted the presentation of a witness's grand jury testimony
to the jury. [309-311]

    The judge at a murder trial did not abuse his discretion in finding
that the defendant had failed to establish a prima facie case of
discriminatory use of peremptory challenges on the Commonwealth's part.
[311-313]

    I found and returned in the Superior Court Department on December 19,
2011.

    The cases were tried before Patrick F. Brady, J.; a motion for a new
trial, filed on February 11, 2015, was considered by Wil-[297] liam F.
Sullivan, J., and a motion for reconsideration was heard by him.

Dennis Shedd for the defendant.

Cailin M. Campbell, Assistant District Attorney, for the Commonwealth.


G, J. A Superior Court jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation. The jury also convicted the defendant of unlawful possession of a firearm. The Commonwealth alleged that the defendant and his codefendant fatally shot the victim, Derrick Barnes, when Barnes returned to his former neighborhood to visit with family and friends.[2] The motive for the killing, according to the Commonwealth, was that the victim had "snitched" to law enforcement in an unrelated case. The defendant asserted an alibi defense by presenting evidence that he dropped his niece off at a church event at around the time of the shooting.

On appeal, the defendant challenges the convictions on grounds of ineffective assistance of counsel. The defendant contends as well that he is entitled to a new trial because the judge erred in allowing the introduction of certain evidence, and because the judge abused his discretion in allowing the prosecutor to exercise a peremptory challenge. For the reasons that follow, we affirm the convictions and conclude that relief under G. L. c. 278, § 33E, is not warranted.

1. Background. We recite the facts the jury could have found, reserving certain details for our discussion of particular issues. The victim and his brother, Darryl Barnes,[3] grew up in the Dorchester section of Boston. In 2009, the victim testified in an unrelated criminal trial, and then moved to a town outside Boston. Thereafter, the victim rarely visited his old neighborhood.

The defendant and the codefendant, who were friends, lived on the same street in the victim's former neighborhood. The defendant was known by the nickname "Drano," while the codefendant was known as "Jigga." During the time that the victim lived on the defendant's street, he "hung out" with the defendant and the codefendant.

On August 27, 2011, the day of a large festival in Boston, the victim and his brother returned to their former address to visit [298] family and friends. The brothers met up with their cousin, Rondale Williams, and some friends. Darryl left to drive another cousin home. The victim and Williams continued to walk down the street, and stopped to talk to Shantee Griffin. Griffin, who had lived at her mother's house, at no. 14, for two years, knew Williams, and the victim was introduced to her as "Doughboy." Eventually, the victim, Williams, another man, and a woman gathered on the front porch of no. 11. Griffin, who had left the victim and Williams, stood on the sidewalk in front of a house located across the street.[4]

At 7:05 .., two men, later identified as the defendant and the codefendant, walked down the street and stopped in front of no. 11. The victim and the codefendant got into an argument. The victim said, "I'm saying, mother, you want to holler at me, holler at me then." The

codefendant asked, "[N]ow, what's up with that rattin' shit?" After this exchange, the codefendant and the defendant, standing side by side on the sidewalk, pulled out handguns and fired multiple shots at the victim. The victim dropped to the floor. Both assailants walked away from the porch. The codefendant turned around, approached the fallen victim, and shot him again at close range. The victim suffered five gunshot wounds, including a fatal wound to the head.

Griffin telephoned 911 and then attempted to aid the victim until police and emergency medical services arrived. At the scene she told police that she had heard shots from across the street but had not seen the shooter. She also provided police with her telephone number. During a telephone interview on the evening of the shooting, Griffin told police the names of the two shooters. Williams was interviewed by police approximately a week after the shooting. He told police that he had been on the porch with the victim when the defendant and codefendant walked up onto the porch. The codefendant pulled out a gun and shot the victim, and then shot him again after he fell. two .32 caliber projectiles from the victim's body. The casings were fired from the same firearm. The [299] two projectiles, however, had been fired from two different weapons.

At trial, the Commonwealth called Williams and Griffin as eyewitnesses. Williams knew both the defendant and the codefendant. He had met the defendant in 2005, when the defendant "was going through a situation" and came to live with one of Williams's relatives. He had known the codefendant for approximately fifteen years. Williams testified that he had been on the front porch with the victim immediately prior to the shooting. He did not hear an argument prior to the gunfire. Williams testified that he could not identify anyone because he never looked at either gunman's face. He also said that he had been highly intoxicated that evening from drinking vodka, smoking marijuana, and "popping" pills, and that he had been "rolling a blunt" when the shooters walked up. Williams also testified that he could not remember talking to police the week after the shooting, when he identified the codefendant as the shooter.

Griffin testified that she did not know the defendant or the codefendant. She said that she had heard gunshots, but did not see the shooting because she was looking in the opposite direction and, in any event, her view across the street had been obstructed. She also testified that she had been pressured by a detective to testify falsely before the grand jury and to present information supplied by the police.

After the judge determined that Griffin and Williams were feigning a lack of memory or testifying inconsistently to prior recorded statements, the Commonwealth was allowed to introduce out-of-court statements, admitted substantively, that Williams and Griffin previously had identified the defendant.[5] These statements included Griffin's telephone call to police, Griffin's and Williams's statements to police during interviews, and Griffin's and Williams's grand jury testimony.

[300] In his interview with investigators, introduced substantively, Williams stated that the defendant and the codefendant (whom he referred

to as "Drano" and "Jigga," respectively) walked up to the porch at no. 11. After an exchange of words with the victim, the codefendant pulled out a gun and fired. Both men then started to leave. The codefendant turned around, returned to the porch, and fired several shots at the wounded victim.

On the evening of the shooting, Griffin told a responding patrol officer that she had heard shots but did not see anything. She told another officer that she had seen a single shooter run away from the scene. Later that evening, a detective telephoned Griffin to follow up on the information she had given the uniformed officers. During that conversation, Griffin said that there had been two assailants, whom she identified as "Drano" and "Jigga."

A few days later, detectives interviewed Griffin at Boston police headquarters. She told them that she had been standing on the opposite side of the street and had observed the defendant and the codefendant (known to her as "Drano" and "Jigga") walk down the street. They said something to the victim (whom she knew as "Doughboy"). The codefendant then pulled out a gun and started firing at the victim. She did not see a firearm in the defendant's hand. She had known the defendant and codefendant "for about a year" from spending time on that street. At the end of the interview, the detectives displayed two photographs of the individuals they believed to be Drano and Jigga. Griffin identified the defendant as Drano and the codefendant as Jigga.[6]

On September 1, 2011, Griffin testified before the grand jury. She testified that she had lived on the same street for approximately two years. When she first moved in, a friend Griffin would see him "almost every day." Griffin was less familiar with the defendant. During the two years that she had lived on the same street, in her mother's house, she had seen the defendant "three to four times." They had never had an actual conversation, but were familiar enough with each other to say hello.

The defendant, who lived with his sister and his niece, presented an alibi defense. On the evening of the shooting, his niece had been scheduled to dance at a church event, and the defendant [301] agreed to take her there. His niece's father, the church pastor, telephoned at 7 .. to find out where she was, and was told that the defendant was on his way. The defendant dropped his niece off at the church at about 7:05 to 7:10 .., and returned to his apartment sometime between 7:20 and 7:25 ..

2. Discussion. The defendant raises three claims in this direct appeal from his conviction combined with his appeal from the denial of his motion for a new trial. First, he contends that he was deprived of the effective assistance of counsel, in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. Second, he argues that the judge erred in allowing a transcript of Griffin's grand jury testimony to be introduced in evidence. Third, the defendant maintains that the prosecutor impermissibly exercised a peremptory challenge to exclude an African- American juror.

a. Ineffective assistance of counsel. In his motion for a new trial, and in his supplemental motion, the defendant raised numerous claims of ineffective assistance by his trial counsel. In particular, the defendant argued that trial counsel was ineffective because he (a) did not move to suppress Griffin's out-of-court identification; (b) did not present exculpatory evidence that would have called into question Griffin's ability to observe the shooters from across the street; (c) did not present testimony from an expert on eyewitness identification; (d) did not request a limiting instruction regarding the codefendant's motive to harm the victim for violating the "no snitching" code; and (e) did not object to misstatements in the prosecutor's closing argument.

The motion judge, who was not the trial judge,[7] ruled that the defendant had not established that trial counsel was ineffective; trial counsel's performance did not fall below that which could be expected from an ordinarily fallible lawyer; and the defendant had not been deprived of an otherwise available, substantial ground of defense. See Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).

In reviewing a claim of ineffective assistance of counsel in a case of murder in the first degree, we apply a more favorable standard of review than that described in Saferian. We use essentially the same standard as we would for an unpreserved error at trial, and determine whether there was error and whether it [302] created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Vargas, 475 Mass. 338, 358 (2016). Otherwise put, "[w]e consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." Id., quoting Commonwealth v. Lessieur, 472 Mass. 317, 327, cert. denied, 577 U.S. 963 (2015). If a defendant's claim of ineffective assistance is based on a tactical or strategic decision, however, we apply the more rigorous standard providing that, to be ineffective, the attorney's decision must have been manifestly unreasonable. See Commonwealth v. Lang, 473 Mass. 1, 14 (2015); Commonwealth v. Kolenovic, 471 Mass. 664, 674-675 (2015), S.C., 478 Mass. 189 (2017).

i. Motion to suppress identification. "The failure of counsel to litigate a viable claim of an illegal search and seizure is a denial of the defendant's Federal and State constitutional right to the effective assistance of counsel" (citation omitted). Commonwealth v. Comita, 441 Mass. 86, 90 (2004). To prevail on an ineffective assistance of counsel claim on this basis, a defendant is required to demonstrate the existence of a viable claim and a likelihood of success on the merits if a motion to suppress had been filed. Id. at 90-91. Upon a finding that trial counsel did not file a motion to suppress where a defendant had a meritorious claim, a defendant must demonstrate as well that admission of the evidence that could have been suppressed created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Fulgiam, 477 Mass. 20, 29, 36-37, cert. denied, 138 S. Ct. 330 (2017); Commonwealth v. Banville, 457 Mass. 530, 534 (2010).

Here, trial counsel provided an affidavit explaining his reasons for not filing a motion to exclude Griffin's out-of-court identification. He averred, "I thought a motion to suppress would not succeed because a judge would consider a dispute as to how often Griffin had seen [the defendant] to be a jury issue and an identification from a single photo is proper when the witness knows the perpetrator."

The motion judge found that counsel reasonably believed that a motion to suppress the identification would have had a minimal chance for success where there was evidence that the witness knew the suspect. See Commonwealth v. Carr, 464 Mass. 855, 871 (2013) ("the witnesses knew the defendant from the neighborhood and witnessed the shooting in broad daylight; it is unlikely that suggestiveness would have played much of a role in [303] their identifications"); Commonwealth v. Adams, 458 Mass. 766, 770-771 (2011) ("Traditional identification procedures such as photographic arrays, showups, and lineups were designed primarily for witnesses who had never before seen a particular individual, or who may have seen the individual previously but on a limited basis. They are not normally used, and are not required, for witnesses who know an individual well"). On this basis, the judge concluded that trial counsel's decision did not deprive the defendant of an otherwise available, substantial ground of defense.

Where, as here, the motion judge was not the trial judge, and did not conduct an evidentiary hearing on the motion, we regard ourselves as in as good a position to assess the record as was the motion judge. See Commonwealth v. Grace, 397 Mass. 303, 307 (1986). After careful review of the record, we agree that the defendant did not establish that excluding the out-of-court identification likely would have influenced the jury's verdicts. In her telephone conversation with police, and subsequent interview at police headquarters, Griffin identified Drano as one of the two men involved in the shooting. The detectives displayed a single photograph of the defendant, and then a single photograph of the codefendant, to Griffin after she provided this information. One of the detectives explained that he displayed the individual photographs in order to confirm that the individuals Griffin knew as Drano and Jigga were, indeed, the defendant and the codefendant.

In his reply brief, the defendant concedes that there was no doubt that he was known as Drano. Three witnesses, Darryl, Williams, and the codefendant, also referred to the defendant by this nickname. Because the defendant has not shown that any error in choosing not to file a motion to suppress likely would have influenced the jury's verdicts, we need not address the issue whether trial counsel bypassed a meritorious motion to suppress the out-of-court identification.

ii. Exculpatory evidence of misidentification. The defendant argues that trial counsel should have introduced exculpatory evidence that Griffin provided police a description of Drano's height that did not reflect the defendant's actual height. The defendant maintains that showing that portions of Griffin's description did not match the defendant's actual characteristics would have "provided objective support" for her testimony at trial that she had not seen the shooter. In her

telephone conversation with the detectives, Griffin described Jigga as a black male, [304] aged twenty-seven to twenty-eight, about five feet, seven inches tall, with a dark mark on the right side of his cheek. She described Drano as a black male in his twenties, with "brown" skin and a "low haircut," wearing a blue polo shirt. Later, in her in- person interview, Griffin told detectives that Jigga is approximately five feet, seven inches to five feet, eight inches tall, and that Drano is shorter. In response to further questioning, Griffin estimated that Jigga is approximately six feet tall, and Drano approximately two inches shorter.

Trial counsel acknowledged that "Griffin stated Drano was shorter than Jigga, but the booking sheets show that [they] are the same height" (both are listed as six feet tall in Boston police department booking sheets). Counsel explained that he did not attempt to elicit that evidence at trial because it would not have added much to the misidentification defense. Instead, in his closing argument, counsel focused on Griffin's trial testimony that she heard gunshots but did not see anything, and attempted to distance the testimony from Griffin's prior statements by arguing that she was a malleable witness, she had not been standing where she said she had been, and she had been so upset by her belief that her close friend had been killed that she had been unable to observe anything accurately. Counsel urged the jury to consider Griffin's demeanor and actions on the surveillance video footage as evidence that she would not have been in a position to identify anyone. The motion judge determined that the failure to introduce the booking sheets did not deprive the defendant of effective representation. He noted that "the height difference was only a couple of inches at most. The jury had the opportunity to view both defendants together at trial and make their own observations."

In light of Griffin's trial testimony that she did not know the defendant, and did not see the shooters, trial counsel's decision not to draw further attention to Griffin's previous statements of identification was not ineffective.

iii. Expert on eyewitness identification. The defendant challenges the adequacy of trial counsel's investigation of the Commonwealth's identification evidence. The defendant maintains that trial counsel was unable to make a reasonable tactical judgment as to how to challenge the eyewitnesses because he did not retain an expert witness to explore well-established factors con-[305]tributing to mistakes in identification.[8]

Trial counsel did not file a motion for funds to retain an expert witness because he believed that the judge would have denied it based on Griffin's familiarity with the defendant. Counsel also believed that he would be able adequately to explore deficiencies in the identification evidence through cross-examination of the Commonwealth's witnesses.

The motion judge reviewed an affidavit submitted by an expert witness retained by postconviction counsel. The expert witness discussed the variables that can affect witness identifications generally and that might have influenced Griffin's and Williams's identifications of the defendant, including distance, lighting, exposure duration, stress, and intoxication. The expert opined that the presence of these risk factors increased the

likelihood of misidentification.

The motion judge concluded similarly that the presentation of an expert witness would not have accomplished anything material for the defense. He noted first that trial counsel challenged the reliability of the pretrial identification evidence through cross-examination of the Commonwealth's witnesses. More importantly, the motion judge concluded that the ability of Griffin and Williams to identify the defendant was not the primary issue at trial. Both witnesses unequivocally testified that they did not observe the shooting itself and could not identify the assailants. The judge observed, "Rather, the issue before the jury was whether the eyewitnesses told the truth prior to trial when they identified [the defendant] as one of the shooters to the police and the grand jury or whether they were telling the truth at trial when [306] they testified that they previously lied and had not actually seen the shooters."

"The decision to call, or not to call, an expert witness fits squarely within the realm of strategic or tactical decisions." Commonwealth v. Ayala, 481 Mass. 46, 63 (2018), and cases cited. Here, the defendant has not established that trial counsel's decision not to retain an expert on eyewitness identification was manifestly unreasonable. See Commonwealth v. Watson, 455 Mass. 246, 257-258 (2009). The jury were required to resolve an issue of credibility, i.e., whether Griffin and Williams had been truthful, prior to trial, when they identified the assailants as Drano and Jigga. See Commonwealth v. Alvarez, 480 Mass. 299, 313, S.C., 480 Mass. 1015 (2018) (witness credibility was not appropriate subject of expert testimony). An expert witness's testimony concerning factors related to mistaken eyewitness identification would not have materially aided the defense; the jury did not need an expert to tell them that Griffin and Williams were perhaps mistaken due to external factors — both testified that they did not closely observe the shooting and insisted that they had not been in a position to identify the suspects. See Ayala, supra at 65 ("we cannot say that trial counsel's decision not to call an expert on eyewitness identification was one that lawyers of ordinary training and skill in criminal law would not consider competent" [quotation and citation omitted]). iv. Limiting instruction on motive evidence. Prior to both men opening fire, the codefendant asked the victim, "[N]ow, what's up with that rattin' shit?" During cross-examination, the codefendant stated that snitches could be both a "bad thing" and a "good thing," but agreed with the proposition that "bad things" could "happen" to "snitches." The codefendant responded affirmatively to the questions whether snitches could get "beat up," "stabbed," or even "killed," "depending on who they told on." The prosecutor used the codefendant's testimony to argue that both defendants "were mad about [the victim] testifying, and bad things happen to snitches."

Trial counsel did not request an instruction limiting the jury's consideration of the codefendant's testimony to the codefendant alone. Counsel acknowledged, in his affidavit, that he "should have done so because there was no evidence that [the defendant] was aware that [the victim] had testified at a trial in 2009 or that he shared [the

codefendant's] opinions about snitching."

In Commonwealth v. Keo, 467 Mass. 25, 33 (2014), we discussed the admissibility of evidence bearing on a defendant's [307] state of mind that a codefendant was motivated to kill the victim. The disputed evidence in that case consisted of numbers scrawled on the codefendant's bedroom wall purporting to signify a desire to kill members of a rival gang. Id. at 30, 32. We concluded that attributing the import of the writings on the codefendant's wall to the defendant was "problematic." Id. at 33. There was no evidence that the defendant saw the writings on the codefendant's wall and affirmed his willingness to harm members of the rival gang. Id.

Here, by contrast, there was circumstantial evidence from which the jury could infer that the defendant and the codefendant shared the same motive to kill the victim. The defendant stood side by side with the codefendant when the codefendant expressed displeasure about "rattin'." As soon as the codefendant made this statement, in effect accusing the victim of violating the "no snitching" code, both men produced firearms and shot the victim.

Moreover, the defendant cannot show that he was prejudiced by trial counsel's failure to request a limiting instruction. Motive is not an element of the crime of murder. See Commonwealth v. Carlson, 448 Mass. 501, 508-509 (2007). The Commonwealth introduced substantial evidence that the defendant shared the codefendant's intent to kill the victim. Producing a firearm and firing at the victim from close range is sufficient to establish such an intent. See Commonwealth v. Gonzalez, 475 Mass. 396, 416 (2016) (bringing firearm to lethal encounter implied shared intent to kill); Commonwealth v. Rosa, 468 Mass. 231, 233-234 (2014) (defendant was one of three shooters seen firing at victim); Commonwealth v. Britt, 465 Mass. 87, 88-89 (2013) (intent to kill established where defendant brought gun to scene and fired at victim).

v. Prosecutor's closing argument. The defendant also argues that counsel was ineffective because he did not object to portions of the prosecutor's closing argument. We review this claim to determine whether any error in failing to object would have created a substantial likelihood of a miscarriage of justice. Vargas, 475 Mass. at 358. See Commonwealth v. Martinez, 476 Mass. 186, 198 (2017). Accordingly, we assess the closing argument "in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." Commonwealth v. Carriere, 470 Mass. 1, 19 (2014).

The defendant contends that the prosecutor misstated the evidence in discussing Griffin's testimony. In particular, in describ-[308] ing Griffin's familiarity with the defendant and the codefendant, the prosecutor argued, "But these are gentlemen who [Griffin] knew for essentially two years, but at least a year. On a daily basis [Griffin] saw both of these guys. She saw them on a daily basis." According to the defendant, this argument has no basis in the trial evidence, as there was undisputed testimony that Griffin had seen the defendant only three or four times over the course of the two years that she lived on the

defendant's street.

We agree that the prosecutor, in part, misstated the evidence with respect to Griffin's familiarity with the defendant. In her interview, Griffin told the police that she had known the defendant and codefendant "[f]or about a year."[9] In her grand jury testimony, Griffin said that she lived on the same street for two years. The prosecutor then asked, "How often, during the time that you lived [there], would you see or encounter [the defendant]?" She answered, "Three to four times." Thus, while the evidence could support the argument that Griffin had known the defendant over the course of two years, at no point did Griffin testify, or tell the police, that she had seen the defendant "on a daily basis."

The defendant also contends that the prosecutor misstated the evidence by arguing that Griffin testified that she saw the defendant shoot the victim. The prosecutor argued that the defendant was "the person in the [g]rand [j]ury [Griffin] indicated, as well, was the person who shot [the victim]." To the contrary, however, Griffin testified before the grand jury that the codefendant opened fire, and that she did not see a gun in the defendant's hand. Thus, as the Commonwealth concedes, the prosecutor improperly misstated the facts.

In the context of the argument as a whole, however, we conclude that the improper statements did not create a substantial likelihood of a miscarriage of justice. While they were misstatements on the critical issue of identification, these were relatively brief misstatements in a complicated case involving two defendants and testimony by reluctant witnesses. They were not repeated or emphasized, and would not have detracted significantly [309] from the other, accurate statements about the identification evidence. See Commonwealth v. Copeland, 481 Mass. 255, 264 (2019); Commonwealth v. Burgos, 462 Mass. 53, 72, cert. denied, 568 U.S. 1072 (2012). In addition, the judge provided the jury with instructions that they were the sole and exclusive finders of fact, and that it is the jury's "collective memory [of the evidence] that controls," and not the memory of counsel. The judge also instructed that the final arguments were just that: "Arguments are arguments. They are not evidence." See Commonwealth v. Goitia, 480 Mass. 763, 768 (2018); Commonwealth v. Rakes, 478 Mass. 22, 46-47 (2017); Commonwealth v. Kozec, 399 Mass. 514, 517 (1987).

b. Admission of grand jury transcript. The defendant challenges the decision to allow the introduction of Griffin's grand jury testimony on the ground that most of Griffin's trial testimony did not contradict what she said before the grand jury.

On direct examination, Griffin testified that she did not recall testifying before the grand jury. When presented with excerpts of her grand jury testimony, she testified that she either did not remember the events, or denied that she had made those statements. For example, she testified concerning her familiarity with the defendant:

Q.: "And then you were asked a question [at the grand jury]: 'Ms. Griffin, during that period of time that you lived on [the defendant's] street, did

you know an individual who went by the name of Drano?' And the indication was yes. Did I read that correctly?"

A.: "No."

Q.: "Did I read that correctly?"

A.: "Yeah, you read the paper."

After a sidebar conference, the judge allowed the Commonwealth's motion to introduce the grand jury testimony substantively because he found that Griffin's lack of memory was feigned. The prosecutor moved to introduce a copy of a transcript of Griffin's grand jury testimony in evidence. The codefendant objected that introduction of the transcript would "accentuate that which was presented once [to the jury] in testimonial form" by what the prosecutor had read during his questioning of Griffin. The defendant joined this objection and added that he would be [310] prejudiced by the cumulative presentation of evidence, much of which was duplicative but some of which had not been introduced at all. The judge overruled the objection, and allowed the transcript to be introduced substantively, pending any redactions the parties might seek.

Because the objection was preserved, we review the defendant's claim for prejudicial error. See Commonwealth v. Nardi, 452 Mass. 379, 396 (2008).

In Commonwealth v. Andrade, 481 Mass. 139, 141 (2018), we considered a claim that the Commonwealth improperly had presented grand jury testimony that was admitted as substantive evidence. As in this case, the prosecutor there "chose to read relevant excerpts from the transcripts, punctuated by questions to the witness as to whether [the witness] recalled giving the grand jury testimony." Id. We held that "although the prosecutor's method was unconventional," the judge did not err in allowing the jury to treat the grand jury testimony as substantive evidence. Id. at 144. In so holding, we noted that the preferable method of introducing prior testimony as substantive evidence is to "read [the transcripts] directly into the record either by one person reading the questions and a colleague reading the answers, or by one person reading the entire excerpt but making clear which portions are questions and which are answers." Id.

Based on our previous decisions, the judge believed that admission of a transcript to supplement oral testimony was a matter of his discretion. See Commonwealth v. Maguire, 392 Mass. 466, 473 (1984); Commonwealth v. Bianco, 388 Mass. 358, 370, S.C., 390 Mass. 254 (1983); Commonwealth v. Mandeville, 386 Mass. 393, 404-406 (1982). He did not have the benefit of the Andrade opinion to guide his decision. If he did, the judge would have sustained the defendant's objection to the admission of the transcripts in evidence presented to the jury. The grand jury transcripts that were introduced as exhibits may have been cumulative of the excerpts presented to Griffin, and it would have been preferable to read the transcript in evidence as set forth in Andrade. It is entirely speculative to assume, however, as the defendant argues, that the jury improperly focused on this tran-[311] script to the exclusion of contradictory evidence.[10]

c. Peremptory challenge. The defendant argues that the judge erred in ruling that the defendant had not established a prima facie case of discriminatory use of peremptory challenges sufficient to support his objection to the prosecutor's exercise of his fourth peremptory challenge to excuse a black woman.

The Fourteenth Amendment and art. 12 "prohibit a party from exercising peremptory challenges on the basis of race or gender." Commonwealth v. Lopes, 478 Mass. 593, 597 (2018). See Batson v. Kentucky, 476 U.S. 79, 95 (1986); Commonwealth v. Soares, 377 Mass. 461, 486, cert. denied, 444 U.S. 881 (1979). A Batson-Soares objection to a proposed peremptory challenge, such as that raised by trial counsel, triggers a three-step process. Commonwealth v. Robertson, 480 Mass. 383, 390-391 (2018). First, the burden is on the objecting party to establish a "prima facie showing of impropriety" sufficient to "overcome[ ] the presumption of regularity afforded to peremptory challenges" (citation omitted). Id. If the judge finds that the objecting party established a prima facie case of discrimination, the party attempting to exercise the peremptory challenge bears the burden of proving a "group-neutral" reason for striking the juror. Id. at 391. Finally, the judge evaluates whether the proffered reason is both adequate and genuine. Id.

We have emphasized that the burden of making the requisite prima facie showing is not "a terribly weighty one." See Commonwealth v. Jones, 477 Mass. 307, 321 (2017), quoting Commonwealth v. Maldonado, 439 Mass. 460, 463 n.4 (2003). The presumption of regularity can be rebutted by "a prima facie showing of either a pattern of challenges of members of the same discrete group, or, in certain circumstances, challenge of a single prospective juror within a protected class, where there is a likelihood that [the juror is] being excluded from the jury solely on the basis of … group membership" (quotation and citations omitted). Commonwealth v. Issa, 466 Mass. 1, 8 (2013). In determining whether a pattern of discrimination exists, a judge may consider all of the relevant circumstances, including (1) "the num-[312] ber and percentage of group members who have been excluded"; (2) "the possibility of an objective group-neutral explanation for the strike or strikes"; (3) "any similarities between excluded jurors and those, not members of the allegedly targeted group, who have been struck"; (4) "differences among the various members of the allegedly targeted group who were struck"; (5) "whether those excluded are members of the same protected group as the defendant or the victim"; and (6) "the composition of the jurors already seated." Jones, supra at 322.

The defendant raised a Batson-Soares objection to the Commonwealth's challenge to juror no. 179, "the third or fourth black person" excused by the prosecutor. The trial judge rejected the defendant's contention that the prosecutor had engaged in a pattern of excluding black jurors. The judge observed that the seated jurors included "four black people out of eight
… . So, obviously the Commonwealth passed on them." The judge observed that the prosecutor had not exercised peremptory challenges on four black jurors who had been excused by request of the defendant or the codefendant. He commented, "So that looks like … eight black African Americans that [the prosecutor has] passed on." Out of fourteen

challenges, the prosecutor sought to remove three prospective black jurors. The judge
for excluding [juror no. 179]."

It does not appear that the prosecutor exercised a disproportionate number of peremptory challenges against prospective black jurors. Juror no. 179 was the thirty-seventh potential juror the judge found to be indifferent. Of the thirty-seven indifferent jurors, twelve were black, and the prosecutor was content with nine (seventy-five percent) of those. In other words, the prosecutor used peremptory challenges to exclude three of the twelve indifferent black jurors (one quarter of the indifferent jurors). At the point when the defendant raised his Batson- Soares objection, four of the eight seated jurors were black. See Commonwealth v. Oberle,
476 Mass. 539, 546 (2017). Because one-half of the then-seated jurors were black, and three- quarters of the indifferent black jurors had not been excluded, there was no abuse of discretion in the judge's determination that the defendant had not established a pattern of racial discrimination.

Relying on Jones, 477 Mass. at 324-325, the defendant argues that the trial judge erred in finding that the "presence of some black people on the jury" was dispositive. This case is readily [313] distinguishable from Jones. In that case, the trial judge "relied primarily, if not exclusively, on the presence of the single African-American who at that point had been seated." Id. at 325. Compare Commonwealth v. Ortega, 480 Mass. 603, 607 (2018) ("judge relied exclusively on the presence of a single female African-American who at that point had been seated in concluding that the defendant had not met his prima facie burden"). Here, by contrast, the trial judge did not rely "exclusively" or "primarily" on the number of black jurors seated in the jury box. He considered the number of potential jurors determined to be indifferent and assessed whether the prosecutor had challenged a disproportionate number of black jurors. We discern no abuse of discretion in the judge's finding that the defendant did not establish a prima facie case of excluding black jurors.

d. Review under G. L. c. 278, § 33E. The defendant asks us to use our authority under G. L. c. 278, § 33E, to grant him a new trial or to reduce the verdict of murder in the first degree. We have conducted a thorough review of the entire record and discern no basis upon which to exercise our authority under G. L. c. 278, § 33E.

3. Conclusion. We affirm the defendant's convictions and the denial of his motion for a new trial.

So ordered.

--------------------------

[page 296]
    [1]Chief Justice Gants participated in the deliberation on this case prior to his death.

[page 297]

[2]At a joint trial with the defendant, the codefendant was convicted of murder in the first degree and unlawful possession of a firearm. We affirmed the convictions. See Commonwealth v. Herndon, 475 Mass. 324, 337 (2016).

[3]Because they share a last name, we refer to the victim's brother, Darryl Barnes, by his first name.

[page 298]
[4]In a police interview and in her grand jury testimony, Griffin said that she had been positioned "across the street" from the house at no. 11, in the area of the houses at nos. 10-12. While the motion judge found that Griffin had been standing outside her house at no. 14, home surveillance videotape footage later revealed that Griffin actually had been standing farther down the street, in front of no. 6.

[page 299]
[5]The judge allowed the substantive introduction of statements by Griffin and Williams to the grand jury "insofar as inconsistent with their trial testimony." See Mass. G. Evid. § 801(d)(1)(A) (2020). He also allowed the introduction as substantive evidence of out-of-court statements of identification made by Griffin and Williams to police. See Mass. G. Evid. § 801(d)(1)(C). The portions of Griffin's August 2011 telephone conversation with detectives that were not relevant to her identification of the perpetrators also were admitted, over the defendant's objections, but the jury were instructed that they were introduced for the limited purpose of establishing Griffin's state of mind. The judge instructed that these other statements were admissible only on the issue whether Griffin's grand jury testimony and statements of identification "were the result of pressure, coercion or suggestion by the police."

[page 300]
[6]The photograph itself, which was introduced in evidence, shows that Griffin wrote on the back, "I know this to be DrainO."

[page 301]
[7]The trial judge had retired.

[page 305]
[8]The defendant also claims that trial counsel rendered ineffective assistance because he should have joined the codefendant's request for an enhanced identification instruction based on State v. Henderson, 208 N.J. 208 (2011). In Herndon, 475 Mass. at 328, the codefendant argued that the judge erred in declining to give the requested instruction in light of the court's subsequent adoption of provisional enhanced identification instructions in Commonwealth v. Gomes, 470 Mass. 352, 376, 379-388 (2015) (Appendix), S.C., 478 Mass. 1025 (2018). We concluded that the trial judge did not abuse his discretion because the codefendant had not provided the trial judge sufficient information to enable "the judge to determine whether the principles in the defendant's proposed instruction were 'so generally accepted' that it would be appropriate to instruct the jury regarding them." Herndon, supra at 329, quoting Gomes, supra at 359-360.

The defendant cannot establish a substantial likelihood of a miscarriage of justice here, on the basis of his request for the same enhanced instruction, where he provided no information whatsoever as to the same point on which the codefendant's presentation was inadequate.

[page 308]
    [9]We reject the defendant's argument that this statement was admitted for the limited purpose of demonstrating whether Griffin's grand jury testimony was coerced. Griffin's familiarity with the defendant provided context for her identification of the suspect and, therefore, was admissible without limitation. See Commonwealth v. Adams, 458 Mass. 766, 772 (2011); Mass. G. Evid. § 801(d)(1)(C) (2020).

[page 311]
    [10]Moreover, to the extent the defendant argues, as he did in his motion for a new trial, that portions of the transcript were introduced that had not first been presented as questions to the witness before the jury, nothing in the transcript that was other than testimony concerning identification (a description of the events surrounding the shooting) would have made a difference in the jury's thinking.

© Copyright 2021 Proprietors of the Social Law Library. All Rights Reserved.

Subject: SJC-11702 – Notice of Docket Entry
From: SJCCommClerk@sjc.state.ma.us
Date: 1/25/21, 6:00 PM
To: dennis@dennisshedd.com

Supreme Judicial Court for the Commonwealth of Massachusetts

RE: Docket No. SJC-11702

COMMONWEALTH
vs.
FREDERICK HENDERSON

NOTICE OF DOCKET ENTRY

Please take note that the following entry was made on the docket of the above-referenced case:

January 25, 2021 - DENIAL of Motion for Reconsideration. (By the Court)

Francis V. Kenneally Clerk

Dated: January 25, 2021

To:
Cailin M. Campbell, A.D.A.
Dennis Shedd, Esquire
Suffolk Superior Court Dept.